# STATE OF CONNECTICUT *v.* MICHAEL CARTER
## (AC 16559)

Foti, Freedman and Stoughton, Js.

Argued November 12, 1997—officially released February 10, 1998

*Pamela S. Nagy*, special assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David J. Strollo*, assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Michael Carter, appeals from the judgment of conviction, rendered after a jury trial, of four counts of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (B), one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3), two counts of robbery in the second degree in violation of General Statutes § 53a-135 (a) (2), and one count of commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k. The defendant received a total effective sentence of twenty years.[1]

On appeal, the defendant claims that the trial court improperly refused to suppress out-of-court identifications of him made by three witnesses for the state and allowed two of those witnesses to identify him in court. The defendant also asserts that remarks made by the prosecutor during the state's rebuttal closing argument

---

[1] The trial court merged the defendant's conviction for robbery in the first and second degrees relating to Kenneth Wetmore, one of the victims, and thereafter sentenced the defendant to fifteen years on the first degree robbery charge. The trial court also imposed fifteen year sentences for each of the four kidnapping charges and a ten year sentence on the remaining second degree robbery charge, all to be served concurrent with the defendant's sentence for first degree robbery. Finally, the trial court imposed a five year sentence for the crime of committing a class A, B or C felony with a firearm to be served consecutive to defendant's sentence for the first degree robbery.

impermissibly infringed on his constitutional right to be present at trial and to confront the witnesses against him as well as his right to testify in his own behalf. We disagree.

The jury reasonably could have found the following facts. On April 3, 1994, at approximately 5:30 p.m., the defendant, wearing a black hat, a black ski mask, black pants, a dark, long-sleeved shirt, a brown belt, work boots and a dark outer vest, entered a fast food restaurant on Whalley Avenue in New Haven. The defendant jumped over the counter, put a gun to the head of the cashier, Tishma Gomez, and ordered her to open the cash register, which she did. The defendant took money out of the register and asked Gomez and two other employees, Douglas Smith and Geneva Ham, where he could find the restaurant manager. One of the employees told the defendant that the manager was in his office in the back of the restaurant. The defendant, still brandishing his gun, directed Gomez, Smith and Ham to walk to the back of the restaurant.

When the defendant took the three employees to the back of the restaurant, Reginald Alston, the sole customer at the time of the robbery, ran next door to a video store to call the police. Alston told the dispatcher that there was a robbery in progress at the restaurant and gave a description of the robber.

When the defendant, Gomez, Smith and Ham reached the door to the manager's office, Gomez knocked. The manager, Kenneth Wetmore, opened the door and the defendant put his gun to Wetmore's head. The defendant demanded the money from the safe in Wetmore's office. The defendant took the money and put it into a black pouch with a yellow design that he wore around his waist. The defendant then tied Wetmore's hands behind his back with the cord from the office fax machine and left the restaurant.

Officer Steven Woznyk responded to the scene after hearing a transmission over his police radio regarding a robbery in progress. Woznyk parked his police car in front of two vans next door to the restaurant. As Woznyk waited for more information about the robbery, the defendant walked between the vans and stopped abruptly behind Woznyk's police car. The defendant looked surprised and ran toward the parking lot behind the restaurant. Woznyk gave chase while simultaneously radioing a description of the defendant. When the defendant reached the fence at the back of the restaurant parking lot, he discarded his vest and jumped over the fence. In the vest pockets were the hat and mask worn by the defendant during the robbery, as well as the keys to the defendant's New York City apartment. Later, police also found the gun used by the defendant on the ground near the vest.[2]

After jumping over the fence, the defendant ran through a bushy area toward the basketball courts on East Ramsdell Street. In response to Woznyk's radio transmissions, Officer Glen Iacovetti drove to East Ramsdell Street and observed the defendant running toward him carrying a black object. Iacovetti ordered the defendant to stop and fired a warning shot at the ground. When he heard the gunshot, the defendant stopped running and dropped the object. Police later searched the area and found the defendant's black and yellow pouch containing $1755 taken in the robbery.

After dropping the pouch, the defendant began to run again. Iacovetti was able to grab the defendant and wrestle him to the ground. Thereafter, several officers,

---

[2] James Stephenson, a criminologist at the state police forensic science laboratory with experience examining firearms, testified that the gun used by the defendant was a pellet gun that was inoperable because "there were fifteen pellets lodged within the interior portion of the barrel." Stephenson also testified that there was no way to tell whether the gun was operable without opening it up and inspecting it.

including Woznyk, arrived and helped Iacovetti subdue and handcuff the defendant. As the officers stood the defendant up, he stated that "he wasn't going to hurt anybody" and that "he just wanted the money." He also said that "he was just trying to make a living" and "take a thousand today, the other thousand tomorrow."

The defendant was then placed in the back of a patrol car. Officer Dario Aponte was watching the defendant when a radio transmission indicated that a pellet gun had been found. The defendant told Aponte that the gun was his and that his fingerprints were on it, but that it did not mean he did anything. Later, as the defendant was being removed from the police car to be viewed by Gomez, Wetmore and Alston, he asked Aponte, "How can they identify me? I had a mask on."

I

The defendant claims that his due process rights were violated when the trial court refused to suppress out-of-court identifications made of him by three witnesses for the state and allowed two of those witnesses to identify him in court.[3] The defendant asserts that the

---

[3] Because the defendant failed to preserve his claim that the out-of-court identification of him made by Wetmore resulted in a violation of his due process rights, he can prevail on his claim only if: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

We find that the defendant has not provided this court with a record adequate to review his claim. The defendant did not object to Wetmore's out-of-court identification of him at the suppression hearing or at trial. As a result, we have "no way of divining what evidence the state might have presented to rebut the defendant's claim of an unconstitutional identification procedure . . . ." *State* v. *Tatum*, 219 Conn. 721, 727 n.11, 595 A.2d 322 (1991); see *State* v. *Crosby*, 36 Conn. App. 805, 819–20, 654 A.2d 371, cert. denied, 232 Conn. 921, 656 A.2d 669 (1995) (without necessary factual and

out-of-court identifications were made under circumstances that were unnecessarily suggestive and that the identifications themselves were unreliable.

Prior to trial, the defendant filed a motion to suppress "potential testimony and other evidence of any out-of-court and in-court identifications of the defendant." The trial court held a suppression hearing at which the following facts were adduced. On the day of the robbery, Gomez was working as a cashier and was able to observe the defendant for a full minute. The restaurant was well lit and Gomez saw that the defendant was wearing a black mask, black jeans and a brown vest. Gomez was able to see the defendant's eyes, which were not covered by his mask. Gomez was also able to see the defendant's gun, which she described as black, brown and silver. Finally, Gomez observed the defendant put the proceeds of the robbery into a black and yellow pouch. When the police arrived, Gomez gave a description of the robber and agreed to accompany the police to view a suspect. Approximately fifteen minutes after the robbery, the police drove Gomez to East Ramsdell Street. Gomez laid down in the back of the police car and, when the police instructed her to sit up, looked and observed the defendant standing in front of another police car about twelve feet away from her. Gomez immediately identified the defendant as the robber on the basis of his eyes and black jeans.

Alston was also in the restaurant at the time of the robbery and was able to see the defendant clearly for approximately two minutes. Alston noticed that the defendant was wearing a black knit hat, a black mask that covered the bottom part of his face, black pants, a long-sleeved black shirt and a black jacket or vest. Alston was also able to see the defendant's eyes and

legal conclusions regarding reliability of out-of-court identification furnished by trial court, court on appeal left to speculate).

forehead. Alston gave the police a description of the robber and agreed to accompany them to look at a suspect. Approximately twenty minutes after the robbery, Alston was driven to East Ramsdell Street. Alston pulled his jacket over his head to avoid being seen by the suspect. The defendant was then removed from a police car parked approximately two car lengths away from Alston. Alston identified the defendant as the robber on the basis of his clothing and build. In addition, Alston said that he could identify the defendant because he had seen part of his face during the robbery.

In denying the defendant's motion to suppress, the trial court concluded that the confrontations leading to both Gomez' and Alston's identifications of the defendant, although suggestive, were not unnecessarily so. In addition, the court found both identifications to be reliable under the totality of the circumstances.

"It is well settled that [i]n determining whether a pretrial identification procedure violated a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . To prevail in his claim the defendant must demonstrate that the trial court erred in *both* of its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances. . . . Generally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Wooten*, 227 Conn. 677, 685–86, 631 A.2d 271 (1993).

Here, the identification procedure used by the police was obviously suggestive. See *State* v. *Collette*, 199 Conn. 308, 310, 507 A.2d 99 (1986) (almost any one-to-one confrontation between victim and person whom police present as suspect presumptively suggestive). We conclude, however, that the identification procedure was justified by the "exigencies of the situation" and thus was not unnecessarily suggestive. *State* v. *Amarillo*, 198 Conn. 285, 293, 503 A.2d 146 (1986).

The identification procedure used by the police was reasonably necessary because it allowed the witnesses to view the suspect while their memories of the incident were still fresh, thus ensuring the reliability of their identifications. See *State* v. *Collette*, supra, 199 Conn. 311; *State* v. *Aversa*, 197 Conn. 685, 694 n.3, 501 A.2d 370 (1985) (prompt on scene confrontations more likely to be accurate). Furthermore, the one-to-one show-up procedure was reasonably necessary to allow the police to "eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay." *State* v. *Amarillo*, supra, 198 Conn. 293. Our Supreme Court has remarked that "[a]n immediate viewing of the suspect may be justified where it [is] important for the police to separate the prime suspect gold from the suspicious glitter, so as to enable them . . . to continue their investigation with a minimum of delay. *State* v. *Collette*, supra, 310–11, quoting *State* v. *Maturo*, 188 Conn. 591, 596, 452 A.2d 642 (1982)." (Internal quotation marks omitted.) *State* v. *Wooten*, supra, 227 Conn. 686–87.

The defendant argues that because Woznyk observed a suspect matching the description of the robber discard a jacket containing a black mask before jumping over the fence and because the defendant made incriminating statements to the police immediately after he was handcuffed, the exigencies of the situation did not

require the witnesses immediately to identify the defendant to verify that they had the proper person. We disagree. The fact that the police had information suggesting that the defendant was the robber does not render the one-to-one identification procedure unnecessary. Moreover, the evidence adduced at the suppression hearing indicated that Woznyk momentarily lost sight of the defendant when he jumped over the fence. Finally, if either Gomez or Alston "had been unable to identify the defendant or had excluded him as a suspect, the police would have had to continue their investigation . . . . See *In re Juvenile Appeal (83-EF)*, 190 Conn. 428, 437, 461 A.2d 957 (1983)." *State* v. *Wooten*, supra, 227 Conn. 687.

Even if we were to assume that the out-of-court identifications were unnecessarily suggestive, the identifications were reliable under the totality of the circumstances. "To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, we must weigh the corrupting effect of the suggestive procedure in light of certain factors such as the opportunity of the [witnesses] to view the criminal at the time of the crime, the [witnesses'] degree of attention, the accuracy of [the witnesses'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. . . . *State* v. *Theriault*, [182 Conn. 366, 373–74, 438 A.2d 432 (1980)]; *Manson* v. *Brathwaite*, [432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)]; *State* v. *Evans*, 200 Conn. 350, 356, 511 A.2d 1006 (1986)." (Internal quotation marks omitted.) *State* v. *Wooten*, supra, 227 Conn. 687–88.

In the present case, both Gomez and Alston had sufficient opportunity to view the defendant during the robbery. Both witnesses testified that the lighting in the restaurant was good and were able to provide the police with detailed descriptions of the clothing worn by the

robber. Gomez testified that her attention was focused on the defendant when he jumped over the counter and that he was "very close." Alston testified that he was paying close attention to the defendant because he had a gun. Both witnesses' descriptions of the defendant to the police were accurate and were made within twenty minutes of the robbery. Finally, both witnesses immediately and positively identified the defendant as the robber. We conclude, therefore, that the out-of-court identifications of the defendant by Gomez and Alston were sufficiently reliable to be considered by the jury.[4]

## II

The defendant next claims that remarks made by the prosecutor during the state's rebuttal closing argument impermissibly infringed on his constitutional right to be present at trial and to confront the witnesses against him[5] as well as his right to testify in his own behalf.[6] We disagree.

---

[4] Because we find that the out-of-court identifications made by Gomez and Alston were not unconstitutional, their subsequent in-court identifications of the defendant need not be excluded. *State* v. *Correia*, 33 Conn. App. 457, 465, 636 A.2d 860, cert. denied, 229 Conn. 911, 642 A.2d 1208, cert. denied, 513 U.S. 898, 115 S. Ct. 253, 130 L. Ed. 2d 174 (1994); see also *State* v. *Gagnon*, 18 Conn. App. 694, 706, 561 A.2d 129, cert. denied, 213 Conn. 805, 567 A.2d 835 (1989) (absent tainted pretrial identification, unnecessary to review suggestibility of in-court identification).

[5] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." This right is applied to state prosecutions through the due process clause of the fourteenth amendment to the federal constitution. See *Pointer* v. *Texas*, 380 U.S. 400, 405, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State* v. *Munoz*, 233 Conn. 106, 143 n.1, 659 A.2d 683 (1995) (*Berdon, J.,* concurring).

Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

[6] The constitutional right to testify in one's own behalf is rooted in the guarantees of the fifth, sixth and fourteenth amendments to the United States constitution. See *Rock* v. *Arkansas*, 483 U.S. 44, 51–53, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); *State* v. *Paradise*, 213 Conn. 388, 404, 567 A.2d 1221 (1990).

During the course of the state's rebuttal closing argument, the prosecutor attacked the defendant's credibility stating: "This defendant's story is just senseless. The defendant just seemed to make things up as he went along. Remember, he's had approximately the last eighteen months to concoct his story. *He listened to the state's case and weaved his tale in between the lines.*" (Emphasis added.) The prosecutor then provided examples of how the defendant had tailored his testimony to fit the state's case. The defendant did not object to any of the remarks made by the prosecutor during the state's rebuttal closing argument. Nevertheless, the defendant argues that his claim is entitled to review under the doctrine of *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), and *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989).[7]

The defendant relies almost exclusively on our Supreme Court's recent decision in *State* v. *Cassidy,* 236 Conn. 112, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), to make out a claim that his rights to be present at trial and to confront the witnesses against him were infringed on by remarks made by the prosecutor during rebuttal closing argument. In *Cassidy,* the court reversed the defendant's convictions for kidnapping, robbery and unlawful restraint because "the prosecutor's argument invited the jury to draw an inference adverse to the defendant solely because he asserted his constitutional right to be present at trial and, [as a result,] unreasonably interfered with the defendant's free exercise of that right."[8]

___

Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

[7] See footnote 3.

[8] The court noted that the prosecutor's statements also infringed on the defendant's constitutional right to testify in his own behalf; however, because the defendant did not raise that claim, the court did not base its decision on it. *State* v. *Cassidy,* supra, 236 Conn. 128 n.16.

Id., 120. The objectionable remarks made by the prosecutor in *Cassidy* were as follows: " 'Now also consider, you notice that the witnesses come in and out and there's no witnesses in court, while the other witnesses are testifying, and that ensures that you're going to hear just that person's version of the story. They're not going to doctor it up to fit the other person's version of the story. There's one witness in this case who heard every other witness testify. He heard the whole story before he told you the story. That means when the defendant took the stand, and I would submit to you that during the three days of trial, hearing all of the witnesses, the defendant had ample time to doctor up his version of the story.' " Id., 121.

At the conclusion of closing arguments, the defendant moved for a mistrial or, in the alternative, for a curative instruction to the jury. Id., 122. Both requests were denied by the trial court. Id.

The court's decision in *Cassidy* was based, in part, on the fact that the comments made by the prosecutor were misleading to the jury because "it [was] by no means certain that the jurors were . . . aware of the fact that the other trial witnesses were not permitted in the courtroom when not testifying" due to the existence of a sequestration order. Id., 124. More importantly, however, the court found that "the prosecutor, in clear, direct and unambiguous terms, urged the jury to conclude that the defendant, *solely by virtue of his presence throughout the trial and in stark contrast to the sequestered state witnesses*, had been able to concoct a story tailored to meet the state's case." (Emphasis in original.) Id., 125. The court stated that "[i]n arguing to the jury that the defendant had been able to 'doctor up' his testimony simply because, in contrast to the state's witnesses, the defendant had been present during the entire trial, the prosecutor invited the jury to draw an inference adverse to the defendant *solely* because of the defendant's exercise of his constitutional

right to confront the witnesses against him." (Emphasis added.) Id., 127–28.

The court qualified its ruling by noting that the defendant placed his credibility in issue by electing to testify and that "the prosecutor, in his closing argument, was free to challenge the defendant's version of the facts by reference to any evidence properly adduced at trial." Id., 128. The court recognized that the prosecutor was not "prohibited from arguing . . . that the defendant had tailored his testimony to fit the state's case," provided that such argument was linked "solely to the evidence and not, either directly or indirectly, to the defendant's presence at trial." Id., 128 n.17.

Here, unlike in *Cassidy*, the defendant did not object to any of the prosecutor's remarks and thus can prevail only if he satisfies the *Evans-Golding* criteria for appellate review of his unpreserved constitutional claim. After a thorough review of the record and transcripts, we find that the defendant's claim fails both the third and forth prongs of *Golding*.

We find the present case to be distinguishable from *Cassidy* in several respects. First, the prosecutor's remarks did not ask the jury to draw an inference adverse to the defendant *solely* because he exercised his constitutional right to confront the witnesses against him. Rather, the prosecutor challenged the defendant's credibility as a witness and provided specific examples, based on the evidence adduced at trial, to illustrate how the defendant had tailored his testimony to fit the state's case. Those examples included the defendant's explanation as to why he was wearing a shirt in his mug shot similar to that worn by the robber, his description of the color of the undershorts he was wearing at the time of the robbery, his unsupported claim that he was beaten by the police and his explanation as to why a set of keys found in the pocket of the vest worn by

the robber fit the door to his New York City apartment. By relying on the evidence adduced at trial to argue that the defendant had tailored his testimony to fit the state's case, the prosecutor engaged in the exact sort of argument approved by our Supreme Court in *Cassidy*. In addition, the prosecutor did not attempt to mislead the jury, nor did he juxtapose the defendant's presence at trial with the sequestration of the state's witnesses as did the prosecutor in *Cassidy*.

The defendant argues that the prosecutor's remark that the defendant tailored his testimony after "listen[ing] to the state's case" was improper and violated the principles of *Cassidy* because it "clearly referred" to the defendant's presence at trial "as the reason why [he] was able to fabricate his testimony." When taken in context with the other remarks made by the prosecutor during rebuttal closing argument, we do not find that the prosecutor's vague reference to the defendant's presence at trial clearly violated the defendant's constitutional right to be present at trial and to confront the witnesses against him or that the remark clearly deprived the defendant of a fair trial. See *State* v. *Golding*, supra, 213 Conn. 240.

The defendant also claims that the remarks made by the prosecutor infringed on his constitutional right to testify in his own behalf. This court recently considered a similar claim in *State* v. *Shinn*, 47 Conn. App. 401, 704 A.2d 816 (1997). In *Shinn*, we relied on the principles of *Cassidy* to reverse the defendant's conviction for attempted murder because remarks made by the prosecutor during the state's rebuttal closing argument "invited the jury to draw an adverse inference from the very fact of the defendant's decision to exercise his fundamental right to testify in his own behalf." Id., 414.

The remarks made by the prosecutor in *Shinn* were as follows: " 'You heard repeated references this afternoon that Mr. Shinn got up and testified. That is his

right, if he wants to do that, he has the perfect right to do that. That is up to him. He also has a right not to testify. Obviously, ladies and gentlemen of the jury, *he heard evidence during the course of the state's case that he felt was, is strong, and so convincing to you, that he felt obligated to get up there and testify* and give you a story. . . . *And if he thought . . . that the state's evidence was too weak in this case, why did he decide to get up here and testify? That's for your judgment to consider.*' " (Emphasis in original.) Id., 408. As in the present case, the defendant did not object to the prosecutor's remarks and sought review pursuant to the *Evans-Golding* doctrine. Id., 408.

In analyzing the defendant's claim in *Shinn*, we emphasized that it did not involve a comment by a prosecutor relating to the "credibility of a defendant who takes the stand," but rather a comment relating to "the fact that a defendant chose to exercise his constitutional right to testify, not to the content of that testimony." Id., 409–10. We then concluded that the statements made by the prosecutor were impermissible because they "were not merely comments on the credibility of the defendant's testimony, but rather were statements that directly linked his decision to testify with his guilt." Id., 414.

In the present case, the defendant argues that "had [he] known the state [would] reduce his defense to a fabricated story merely due to his decision to take the stand, it might easily have stifled his decision to exercise [his right to testify in his own behalf.]" The defendant's argument misconceives both the facts of this case and our Supreme Court's holding in *Cassidy*. In addition, the comments made by the prosecutor in this case are distinguishable from those made by the prosecutor in *Shinn*.

Here, the prosecutor did not challenge the defendant's credibility "merely" because he chose to testify in his own defense, but rather because the defendant's testimony contradicted the substantial physical and testimonial evidence introduced by the state. In *Cassidy*, our Supreme Court recognized that "when the defendant elected to testify, he placed his credibility in issue, thereby subjecting himself to cross-examination under 'the same rules and tests which could by law be applied to other witnesses.' *State* v. *McClendon*, 199 Conn. 5, 12, 505 A.2d 685 (1986). Moreover, the prosecutor, in his closing argument, was free to challenge the defendant's version of the facts by reference to any evidence properly adduced at trial." *State* v. *Cassidy*, supra, 236 Conn. 128; see *State* v. *Shinn*, supra, 47 Conn. App. 413.

The statements made by the prosecutor were proper comments on the credibility of the defendant's testimony and did not invite the jury to draw an inference adverse to the defendant solely on account of the defendant's assertion of his constitutional right to testify in his own behalf. The defendant, therefore, has failed to establish that a constitutional violation clearly exists and clearly deprived him of a fair trial.

Even if we were to assume that the prosecutor's remarks were improper, the defendant would not be entitled to a new trial because the state has established that the allegedly objectionable comments were harmless beyond a reasonable doubt. See *State* v. *Cassidy*, supra, 236 Conn. 129; see also *Coy* v. *Iowa*, 487 U.S. 1012, 1021, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988); *State* v. *Lewis*, 211 Conn. 185, 190, 558 A.2d 237 (1989).

In *State* v. *Cassidy*, supra, 236 Conn. 131–32, the court based its decision that the prosecutor's remarks were not harmless on the fact that (1) the state's case rested entirely on the uncorroborated testimony of the victim, (2) the relative credibility of the defendant and

the victim was critical to the jury's resolution of the case, (3) there was no independent evidence of the crimes to assist the jury in that determination, and (4) the trial court failed to give a curative instruction as requested by the defendant. Similarly, in *State* v. *Shinn*, supra, 47 Conn. App. 417, "the defendant and the victim . . . were the only witnesses with firsthand knowledge of the events pertinent to the attempted murder charge. The critical question to be resolved by the jury, therefore, was which of the two eyewitnesses was telling the truth."

In contrast to the state's cases in both *Cassidy* and *Shinn*, here the state's case did not rest entirely on the uncorroborated testimony of a single victim. As previously discussed, the defendant was identified as the robber shortly after the robbery by three witnesses, two of whom later identified him in court. The defendant fled when confronted by the police and discarded a vest and pouch that were later identified as belonging to the robber. In addition, the vest contained the hat and mask worn by the robber as well as the keys to the defendant's New York City apartment. Finally, the defendant made several incriminating statements after being taken into custody.

Although the credibility of the defendant was important to the jury's resolution of the case, it was not critical due to the existence of independent evidence of the crime, including the physical evidence and the testimony of the other witnesses for the state. Finally, the defendant did not seek a curative instruction nor did he object in any way to the prosecutor's remarks. See *State* v. *Oehman*, 212 Conn. 325, 338, 562 A.2d 493 (1989) (conclusion that comments made by prosecutor did not result in prejudice to defendant sufficient to warrant reversal of conviction buttressed by defendant's failure to make prosecutorial misconduct claim

at trial, or to object to portions of prosecutor's summation complained of on appeal).

Given the facts of this case, we are persuaded that the allegedly improper comments made by the prosecutor were harmless beyond a reasonable doubt. Accordingly, we affirm the defendant's convictions on the kidnapping and robbery charges.

III

As a final matter, we note that the parties were permitted to file supplemental briefs to address the issue of whether the defendant's conviction for committing a class A, B or C felony with a firearm pursuant to § 53-202k should be vacated because that statute is a sentence enhancement provision and not a separate crime.

Our Supreme Court has recently held that "§ 53-202k is a sentence enhancement provision and not a separate crime." *State* v. *Dash*, 242 Conn. 143, 150, 698 A.2d 297 (1997). In *Dash*, the court recognized that the defendant's total effective sentence was proper, but modified the judgment to "reflect the fact that § 53-202k does not constitute a separate offense." Id. Accordingly, the defendant is entitled to have his conviction under § 53-202k vacated.

The judgment is reversed in part and the case is remanded with direction to vacate the defendant's conviction under § 53-202k and to resentence the defendant to a total effective term of imprisonment of twenty years in accordance with this opinion.

In this opinion the other judges concurred.