STATE OF CONNECTICUT *v.* WILLIAM JAMES
(AC 17248)

Foti, Landau and Hennessy, Js.

Argued March 24—officially released June 29, 1999

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary Nicholson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, William James, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1),[1] use of a firearm in the commission of a class A, B or C felony in violation of General

---

[1] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

Statutes § 53-202k[2] and criminal possession of a weapon in violation of General Statutes § 53a-217.[3] On appeal, the defendant claims that the evidence was insufficient to support his conviction for manslaughter in the first degree. In addition, he claims that the trial court improperly (1) instructed the jury on the duty to retreat, (2) admitted prior misconduct evidence and (3) allowed separate convictions to stand for manslaughter under § 53a-55 (a) (1) and the commission of a class B felony with a firearm under § 53-202k. The defendant finally claims that he was denied a fair trial by three incidents of purported prosecutorial misconduct during closing argument. We vacate the judgment of conviction for the violation of § 53-202k and affirm the judgment of the trial court in all other respects.

The jury reasonably could have found the following facts. On June 28, 1994, the sixty-six year old defendant shot the thirty-two year old victim, Sherry Drake, causing her death. The two had a nine year intimate relationship that ended with the victim's death. The defendant resided at 92 Hudson Street in New Haven. During a substantial portion of their relationship, the victim shared that residence with the defendant. Their relationship was characterized by specific incidents of domestic violence in which firearms were used.

[2] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[3] General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm . . . when he possesses a firearm . . . and (1) has been convicted of . . . a class D felony under sections 53a-60 to 53a-60c, inclusive, 53a-72a, 53a-72b, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216 . . . ." During trial, the defendant stipulated that on July 17, 1987, he was convicted of a class D felony.

On the night of June 28, 1994, at approximately 10:25 p.m., Sergeant Anthony Griego of the New Haven police department was dispatched to 92 Hudson Street. Upon his arrival, he observed the defendant standing in the doorway and, directly behind the defendant, he observed the victim lying on the floor in a pool of blood. The defendant blurted out, "I shot her because she jumped on me. Look how big she is. I shot her." The defendant told Griego that he put the gun in the rear bedroom. Griego noted that the defendant had not sustained any gunshot or knife wounds, his clothes did not appear to be ripped, his eyes were not swollen and his face was not cut. Griego further observed that the defendant seemed "fine" and did not seem to be overly emotional.

Officer Jonathan Haddad arrived at the scene shortly thereafter. Haddad heard the defendant repeatedly state, "I told her to get off, she jumped on me, I told her to get off, so I shot her." He also heard the defendant state, "I shot her twice and the gun is on the bed." Haddad observed nothing about the defendant's appearance that led him to believe that the defendant had been involved in a physical altercation, such as cuts, abrasions or bleeding. In addition, there were no weapons, guns or knives near the victim's body.

A .38 caliber revolver containing four live rounds and two spent shell casings was recovered from the defendant's bedroom. Later tests showed that the bullets that killed the victim had been fired from that weapon. The victim had been shot at close range once in the neck and once in the right armpit. Both were fatal wounds. At the time of her death, the victim had a blood alcohol level of 0.32, and a small amount of cocaine was detected in her system. In his statement to the police that night, the defendant admitted shooting the victim twice following an argument. Additional facts will be set forth where relevant to the issues on appeal.

I

The defendant first claims that there was insufficient evidence to support his conviction for the crime of manslaughter in the first degree.[4] We disagree.

"In reviewing [a] sufficiency [of the evidence] claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994). Our review is limited to determining whether the inferences drawn by the jury from the evidence presented are so unreasonable as to be unjustifiable. *State* v. *Ford*, 230 Conn. 686, 692, 646 A.2d 147 (1994). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *State* v. *Boykin*, 27 Conn. App. 558, 563–64, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992).

To convict the defendant of manslaughter in the first degree, the state was required to prove beyond a reasonable doubt that (1) the defendant intended to cause serious physical injury to the victim and (2) he caused her death. See General Statutes § 53a-55 (a) (1). "The intent to cause serious physical injury required for a conviction of manslaughter in the first degree under § 53a-55 (a) (1), by definition, required a jury's finding

---

[4] The defendant was charged with the crime of murder in violation of General Statutes § 53a-54a. The defendant requested that the trial court instruct the jury on manslaughter in the first degree, as a lesser included offense of murder. The jury returned a verdict of guilty of the lesser offense.

that the defendant caused a physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of a bodily organ. General Statutes § 53a-3 (4)." (Internal quotation marks omitted.) *State* v. *Allen,* 28 Conn. App. 81, 89, 611 A.2d 886, cert. denied, 223 Conn. 920, 614 A.2d 826 (1992).

The defendant does not contest that he caused the victim's death; rather, he claims that the evidence was insufficient to show that he *intended* to cause her serious physical injury when he shot her twice at close range. A person's intent may be inferred from his conduct, as well as the surrounding circumstances, and is an issue for the trier of fact to decide. *State* v. *Nosik,* 245 Conn. 196, 208, 715 A.2d 673 (1998). "[A] factfinder may infer an intent to cause serious physical injury from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident." *State* v. *Allen,* supra, 28 Conn. App. 89–90.

In the present case, there was sufficient evidence from which the jury reasonably could have inferred the requisite intent to cause serious physical injury to the victim. First, the evidence showed that the defendant had been around guns most of his life, had been trained and was experienced in the use of firearms. There were times when he had as many as twenty guns in his house. He understood the extent of injury that could be inflicted by the use of a handgun. On the date in question, he fired two bullets into the victim, one entering her neck and the other entering her body through her armpit, at close range. The jury heard evidence that on two prior occasions, the defendant had shot the victim during arguments.

Further, on the night of the shooting, his statements to police reasonably could have suggested that the

defendant intentionally shot the victim. Following the shooting, the defendant did not call for medical assistance for the victim, nor did he attempt to provide medical assistance himself. The defendant admitted in his statement to the police, and during his testimony at trial, that he had shot the victim; he claimed, however, that the gun discharged while both struggled for control of the weapon. When conflicting explanations are presented, the jury is not required to accept the testimony and inferences offered on behalf of the defendant. See *State* v. *Sauris*, 227 Conn. 389, 402, 631 A.2d 238 (1993).

The evidence presented at trial was more than sufficient for the jury reasonably to have inferred that the defendant intended to cause serious physical injury to the victim and that the shooting was not accidental. The evidence, therefore, was sufficient to sustain a conviction of manslaughter in the first degree.

## II

The defendant next claims that the trial court improperly instructed the jury on the duty to retreat imposed by General Statutes § 53a-19 (b). Specifically, the defendant claims that the trial court improperly instructed the jury that a codweller is a person who is "usually lodged in [the] premises at night." We disagree.

Generally, "a person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose . . . ." General Statutes § 53a-19 (a). However, "a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, *except that the actor shall not be required to retreat if he is in his dwelling* . . . ." (Emphasis added.) General Statutes § 53a-19

(b). In other words, a person has no duty to retreat before resorting to the use of deadly physical force if he is attacked in his own dwelling.

The "dwelling" exception to the duty to retreat does not apply, however, if the actor is "threatened by another person who also dwells in the same place." *State* v. *Shaw*, 185 Conn. 372, 379, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982). This codweller retreat rule was adopted by our Supreme Court from the Restatement (Second), Torts § 65 (1965) which provides: "The privilege [to defend oneself against another by force intended or likely to cause death or serious bodily harm] exists although the actor correctly or reasonably believes that he can safely avoid the necessity of so defending himself by (a) retreating if he is attacked within his *dwelling place, which is not also the dwelling place of the other* . . . . The privilege . . . does not exist . . . *in a place which is also the dwelling of the other* . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Shaw*, supra, 382.

During the course of the trial, conflicting evidence was presented as to whether the victim was, in fact, a codweller at 92 Hudson Street, the defendant's home. For example, a portion of the defendant's testimony indicated that the victim was not living at that address on the night of the incident. In other parts of his testimony, however, and in statements to police, the defendant suggested that he and the victim were living together at that time. In addition, the defendant's son testified that the two were living together, that the victim kept her clothes in the house and that she was there the night before her death.

The defendant, in filing his written requests to charge, specifically sought that the trial court's charge include,

as part of self-defense, the defendant's duty to retreat.[5] The trial court instructed substantially as requested.[6] In the defendant's request to charge, the defendant

[5] The defendant's written request to charge provided in relevant part: "The law does not encourage the use of deadly force, and in most circumstances, a person must retreat from a perceived harm, if he is capable of doing so with complete safety. [The defendant] would not have been justified in using physical force if you are convinced the state proved beyond a reasonable doubt that (1) [the defendant] had a duty to retreat, and if such retreat was completely safe and available . . . .

"Under the self-defense provisions, a person has no duty to retreat if the confrontation occurs in his home. You have heard conflicting testimony concerning whether [the victim] lived at 92 Hudson [Street]. If you find that [the victim] did not reside at 92 Hudson [Street], then [the defendant] had no duty to retreat from the encounter. If you believe that [the victim] was a resident of 92 Hudson [Street], then you, the jury, must determine whether safe retreat was available, and whether the defendant knew of it."

In addition, during closing argument, defense counsel stated: "Now, ordinarily in your own home if you're attacked by somebody you have no obligation to retreat. In this case, there may be a duty to retreat. This is an issue for you to resolve if you find that [the victim] was a codweller living there with [the defendant], in other words, at that time. Because if that's a fact then she has some protections by virtue of being there in her home as well as his home, and therefore he would have some duty to retreat."

[6] The court instructed on the defendant's duty to retreat as follows: "There are three separate circumstances under which a person is not justified in using deadly physical force. If the state proves beyond a reasonable doubt any one of these circumstances, you shall find that the defendant was not justified in using deadly physical force. You must consider each circumstance separately and independently of the others and your decision on any one of them is not controlling on the rest. . . .

"Under the third circumstance, a person is not justified in using deadly physical force upon a codweller. . . .

"As a general rule, a defendant is not required to retreat in his own dwelling before he may use force. A dwelling is defined in our law as a place which is usually occupied by a person lodging therein at night. Usually occupied means customary or routine nightly occupancy. To this general rule there is an exception which you may or may not apply here, that will be for you to determine as a question of fact. That exception is that one claiming self-defense in his own dwelling has the duty to retreat from a codweller before he may employ force against that codweller. A codweller is a person who also is usually lodged in those premises at night.

"Accordingly, you must first determine if the state has proven that [the victim] was a codweller with the defendant at 92 Hudson Street. If the state has failed to prove that [the victim] was a codweller, then you go no further on this issue as the defendant would have no duty to retreat. If, however,

requested that the trial court employ words such as "reside," "lived" and "resident," in reference to the victim's status as a codweller. The defendant's argument that the trial court did not "substantially" charge as requested by failing to employ these words is totally without merit.

The trial court instructed that the jury must first determine whether the state had proven that the victim was a codweller with the defendant at 92 Hudson Street and, if it found that the state had failed to prove that, it need go no further on the issue because the defendant would have no duty to retreat. The trial court went on to instruct, however, that if the jury found the victim to have been a codweller, then it had to consider whether the defendant had a duty to retreat in accordance with the rule that a person is not justified in using deadly physical force upon a codweller if he knows that he can avoid the necessity of using force or retreating with complete safety. The trial court described a co-

---

you find that the state has proven that [the victim] was a codweller with the defendant, you would then consider whether the defendant had a duty to retreat in accordance with the following rule. Under the third circumstance, a person is not justified in using deadly physical force upon a codweller if he knows that he can avoid the necessity of using such force or retreating with complete safety. This means both that retreat was completely safe and available and that the defendant knew it. Complete safety means without any injury whatsoever to him. As I have said, self-defense requires you to focus on the person claiming self-defense on what he reasonably believed under the circumstances and it presents a question of fact as to whether a retreat with complete safety was available and whether the defendant knew it. The law stresses that self-defense cannot be retaliatory, it must be defensive and not punitive so you must ask yourself, did the defendant know that he could avoid the use [of] deadly force by retreating with complete safety. If so, and yet he chose to pursue the use of deadly physical force, you shall reject the self-defense claim. If you find that the state has proven beyond a reasonable doubt that the defendant and [the victim] were codwellers and that a retreat with complete safety was available to the defendant and that the defendant knew it, but did not retreat, you shall then find that the state has proven beyond a reasonable doubt that the defendant was not justified in using deadly force."

dweller as "a person who . . . is usually lodged in those premises at night."

The defendant appears to argue, for the first time on appeal, that the trial court should have instructed that the victim should not have been considered a codweller if she was committing a crime, such as assault or robbery, or was in violation of a protective order when she entered his home. "A party is not entitled to have a claim reviewed on appeal on grounds different from those presented at trial. . . . To hold otherwise would result in trial judges' being found to have erred on questions never fairly presented to them." (Citation omitted.) *State* v. *Adams*, 36 Conn. App. 473, 482, 651 A.2d 747 (1994), appeal dismissed, 235 Conn. 473, 667 A.2d 796 (1995).

Under § 53a-19, before resorting to the use of deadly physical force, an "actor shall not be required to retreat if he is in his dwelling . . . ." For purposes of § 53a-19, the term "dwelling" is defined as "a building which is usually occupied by a person lodging therein at night . . . ." General Statutes § 53a-100. We find, therefore, that the trial court's description of a codweller as "a person who *also* is usually lodged in those premises at night" was not improper. (Emphasis added.) We conclude that the trial court's instructions on the duty to retreat were correct in the law, adapted to the issues and sufficient to guide the jury. See *State* v. *Cooper*, 182 Conn. 207, 211, 438 A.2d 418 (1980).

## III

The defendant next argues that the trial court improperly admitted prior misconduct evidence to show motive, intent and the absence of mistake or accident. We do not agree.

On the night of the killing, June 28, 1994, the defendant voluntarily gave a statement to police, which was

taped. Included in this statement was the defendant's acknowledgment that, on two prior occasions, he and the victim had physical altercations that resulted in the victim's being shot. One such incident occurred during the early morning of December 4, 1991. The second incident occurred on February 22, 1994. Following both incidents, the defendant gave statements to police fully disclosing the details of those incidents. The defendant's June 28, 1994 statement was admitted into evidence, in its entirety, without objection.

Thereafter, the state, in an offer of proof outside the presence of the jury, indicated to the trial court that it intended to introduce the two statements that the defendant had given police following his previous physical confrontations with the victim on December 4, 1991, and February 22, 1994, respectively. It is the introduction of the December 4, 1991 statement that the defendant now claims was improper. In the December 4, 1991 statement, which was introduced as a full exhibit and read in its entirety to the jury, the defendant described the incident as follows: On the morning of December 4, 1991, between 1 and 1:30 a.m., the victim attempted to gain entrance to the defendant's home at 92 Hudson Street. The defendant refused to allow the victim to come in. At some point, however, she was able to get inside, holding what the defendant described as a three and one-half to four foot ax handle. The defendant asked the victim to leave, but she refused.

The defendant then retrieved a .22 caliber pistol that he had placed under a pillow in his bedroom. He told the police that he took out the pistol to "see if [he] could frighten her to leave . . . ." After he displayed the handgun, however, the victim jumped on top of him on the bed and the two started to wrestle. During the altercation, which lasted "a couple of minutes . . . the gun went off about two or three times and [the victim] stopped tussling." He admitted that his finger was

"probably" on the trigger of the gun while he and the victim were fighting. After the weapon was fired, the victim got up and walked out. It was later determined that the victim had sustained a gunshot wound to the chest.

The state argued that this prior incident was relevant to the issue of the defendant's intent and to refute a claim of accident. The defendant argued that such evidence was not relevant to the issue of intent and, because the defendant clearly did not intend to murder the victim during the prior incident, such evidence could not be used to prove that he intended to murder the victim on June 28, 1994.

The trial court, after reviewing both statements, admitted them for the limited purpose for which they were being offered. Thereafter, when the jury returned to the courtroom, the trial court gave the following limiting instruction: "Now, in the course of the next two witnesses, you are going to hear evidence or testimony concerning two statements that the defendant made on prior occasions. One of those occasions being on December 4, 1991, and the other on February 23, 1994. This is another limiting instruction that I am about to give you. The evidence which you will hear about those statements is going to be admitted for a limited purpose. That is on the issues of intent, motive, the absence of mistake or accident, and who was the initial aggressor, all of which I will deal with when I give you my final charge on the law. The bottom line very simply right up front is that there are very limited purposes for which those statements are going to be offered, and those are the purposes that I have just identified for you. You are expressly prohibited from using that evidence as evidence of any bad character of the defendant or as any evidence of a tendency on his part to commit criminal acts. If you find the evidence credible . . . you can consider it for the sole and limited purpose of

assisting you in determining those issues, that is, intent, motive, the absence of mistake or accident and the question of who was the initial aggressor. You can't consider the evidence for any other purpose."

In the trial court's final instructions to the jury, it charged as follows: "I gave you a charge in the case when you heard the statements of the defendant that were given in 1991 and in 1994, I think it was. I'm referring specifically to certain evidence, namely, the defendant's statements to the police on December 4, 1991, and on February 23, 1994 . . . . They were admitted for a limited purpose, that is, on the issues of intent, motive, and the absence of mistake or accident and who was the initial aggressor. I do not mean to emphasize the statements or to give them any special weight in your eyes, I simply want to be sure that you understand that your consideration of these statements is strictly limited to the specific purposes for which I allowed them into evidence. You are expressly prohibited from using the statements as evidence of the bad character of the defendant or as evidence of a tendency to commit criminal acts. If you find any of this evidence credible . . . you may consider it solely to assist you in determining the issue to which I have limited it and for no other purpose. . . ."

Generally, "[u]ncharged misconduct evidence must satisfy a two part test in order to be admitted as an exception. The evidence must be relevant and material to at least one of the claimed exceptions, and its probative value must outweigh its prejudicial effect." *State* v. *Weidl,* 35 Conn. App. 262, 265, 644 A.2d 1313, cert. denied, 231 Conn. 914, 648 A.2d 160 (1994). "Evidence of uncharged misconduct may not be admitted to show a person's propensity to commit a certain type of crime, but it is admissible to prove issues such as motive, intent, opportunity, or a common scheme or system of criminal activity." *State* v. *Plaza,* 23 Conn. App. 543,

549, 583 A.2d 925 (1990), cert. denied, 217 Conn. 811, 587 A.2d 153 (1991). "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Braman*, 191 Conn. 670, 676, 469 A.2d 760 (1983).

"Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable." (Internal quotation marks omitted.) *State* v. *Ulen*, 31 Conn. App. 20, 28, 623 A.2d 70, cert. denied, 226 Conn. 905, 625 A.2d 1378 (1993). In applying these principles to the facts of this case, we conclude that the trial court did not abuse its discretion in admitting the evidence in question.

The trial court concluded that the evidence concerning the December 4, 1991 incident was relevant to the issues of motive, intent, and as to whether the incident in question was an accident. In his December 4, 1991 statement to police, the defendant indicated that he pulled out the gun before being attacked. In addition, he stated that during his altercation with the victim, the gun was in his hand and that his finger was "probably" on the trigger. He also admitted that the pistol discharged "about two or three times" before the victim "stopped tussling."

The defendant's statement was relevant, not necessarily to prove intent in and of itself, but rather "to establish, in connection with the question of intent, a pattern of behavior and an attitude toward the [victim] that is indicative of the defendant's state of mind." *State* v. *Tucker*, 181 Conn. 406, 415, 435 A.2d 986 (1980). In short, the evidence was admissible to show that the

victim's death resulted from an intentional act rather than from an accident.[7] Id., 416. As our Supreme Court has noted, "[b]ecause intent is almost always proved, if at all, by circumstantial evidence, prior misconduct evidence, where available, is often relied upon." *State v. Baldwin*, 224 Conn. 347, 355, 618 A.2d 513 (1993).

After a finding that the evidence is relevant to the issue of motive or intent, the trial court must then decide whether the admission of that evidence is warranted because its probative value outweighs its prejudicial effect. *State v. Aponte*, 50 Conn. App. 114, 123, 718 A.2d 36, cert. granted, 247 Conn. 926, 719 A.2d 1169 (1998). Here, the trial court, in noting that the evidence was probative on the issue of motive, intent, and as to whether the shooting was accidental, concluded that it was not unduly prejudicial. We agree. The jury had learned that the defendant had shot the victim on two prior occasions through his statement of June 28, 1994, which had already been admitted into evidence without

[7] The relevancy of this evidence must be viewed in light of the admission of additional evidence, also introduced in the form of the defendant's statement to police, concerning the second incident, which occurred on February 22, 1994. In his statement at that time, the defendant admitted shooting the victim during a physical confrontation. After stating that he had shot the victim in the hip, the defendant indicated that the incident "could have been a lot worse" because he "could have reached up a little higher . . . [and] have hit her through the chest." Later during that statement, the defendant stated: "I'm not gonna let her beat me up—beat up on me any time she feels like it now, that's where we have a problem, ya know, we can't talk it out, ya know. . . . She's not going to beat up on me anytime she feels like it." This additional evidence supports our conclusion that the December 4, 1991 incident evidences "a pattern of behavior and an attitude toward the victim that is indicative of the defendant's state of mind." *State v. Tucker*, supra, 181 Conn. 415.

Additionally, while it appears that the defendant objected to the introduction of this evidence at trial, he has not claimed on appeal that its admission was improper. He argues only that the introduction of the evidence concerning the 1991 incident was improper. So, while we note the introduction of this evidence at trial in our analysis of the defendant's claim on appeal, we do not undertake an independent review of the propriety of that admission.

objection. The trial court observed also that parts of the statement actually "reflect[ed] to the defendant's benefit."[8] In addition, the trial court repeatedly cautioned the jury on the limited use of this evidence. We find, therefore, that the trial court did not abuse its discretion in allowing into evidence the defendant's prior misconduct in the form of his 1991 statement to police.

## IV

The defendant next claims that he was denied a fair trial by the prosecutor's repeated acts of purported misconduct during closing argument. We do not agree.

It is well established that prosecutorial misconduct can occur in the course of closing argument. See *State* v. *Atkinson*, 235 Conn. 748, 768–69, 607 A.2d 276 (1996). "While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone*, 96 Conn. 160, 169, 113 A. 452 (1921). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith* v. *Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). In order to deprive a defendant of his constitutional right to a fair trial, the prosecutor's conduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Williams*, 204 Conn. 523, 539, 529 A.2d 653 (1987).

---

[8] The defendant subsequently acknowledged this potential benefit by requesting the trial court to instruct the jury that it could consider the statements in assessing who was the initial aggressor for purposes of the defendant's claim of self-defense. The defendant also argued that the facts set forth in the 1991 statement were exculpatory rather than inculpatory.

The defendant points to three purported instances of prosecutorial misconduct that occurred during closing argument. We will review each specific instance in turn.

A

During the defense portion of the trial, the defendant called Ronald Anderson, a clinical psychologist, as a witness, who diagnosed the defendant as a battered spouse, and testified that the defendant, at times, legitimately feared for his life, but, at other times, had warm feelings for the victim. To rebut this testimony, Anderson was cross-examined about the defendant's aggressive behavior.[9] In so doing, the state examined Anderson concerning twelve prior incidents of violence that were documented in police reports detailing the defendant's criminal conduct from 1989 to 1994. The questions concerning the information in those reports were allowed solely to test the basis for Anderson's opinions about the defendant.

During closing argument, the prosecutor sought to argue that Anderson's conclusions that the defendant was a "battered spouse" and had a "passive submissive" personality were incorrect in view of his testimony on cross-examination dealing with the numerous police reports, many of which portrayed the defendant as the aggressor. The defendant contends that the argument was improper because the prosecutor was using the police reports as "substantive evidence" rather than as evidence admitted for the limited purpose of testing Anderson's conclusions.

In determining whether this claim of prosecutorial misconduct deprived the defendant of his due process

---

[9] The state argues that we should not review this claim because the defendant raised no objections to the use of the police reports and did not seek a limiting instruction regarding this evidence when it was admitted. The defendant claims that this evidence was admitted for the limited purpose of testing Anderson's diagnosis and that an appropriate limiting instruction was sought. We agree that this claim should be reviewed.

right to a fair trial, we must first decide whether the prosecutor's remarks were, in fact, improper, and, if so, whether they substantially prejudiced the defendant. *State* v. *Oehman*, 212 Conn. 325, 336, 562 A.2d 493 (1989). In doing this, "we focus on several factors: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." *State* v. *Williams*, 41 Conn. App. 180, 190, 674 A.2d 1372, cert. denied, 237 Conn. 925, 677 A.2d 950 (1996).

Our review of the remarks leads us to conclude that, while the prosecutor may have come very close to overstepping the bounds when referring to the police reports, even if he did make substantive use of the evidence, he did so briefly and that use was neither egregious nor blatant. "Because the challenged conduct occurred solely during the prosecutor's closing argument, by definition it did not evince a pattern of conduct that was repeated throughout the trial." *State* v. *Provost*, 49 Conn. 56, 65, 713 A.2d 879 (1998), aff'd, 251 Conn. 252, 741 A.2d 295 (1999).

Further, the trial court gave a limiting instruction in referring to Anderson's testimony, as well as to the use of the police reports, and cautioned the jury that it was "expressly prohibited from using any of this evidence as evidence of any bad character on the part of the defendant or of a tendency by him to commit criminal acts." The jury is presumed to follow the trial court's instructions. *State* v. *Richardson*, 214 Conn. 752, 757, 574 A.2d 182 (1990). We conclude, therefore, that this claim is without merit.

## B

The defendant has also claimed that the state argued improperly that the defendant was predisposed to commit murder because he had three felony convictions, evidence of which was introduced during the cross-examination of the defendant for the sole purpose of attacking his credibility. Specifically, the defendant claims that the prosecutor improperly used evidence of the prior convictions as "misconduct evidence" in his references to them during closing argument. We do not agree.

The prosecutor remarked during his closing argument: "Now, there's one thing I want you to keep in mind during the course of your deliberations on this case and it's a very common sense principle, ladies and gentlemen, and that is a very simple phrase, you can't tell a book by its cover. You can't do that. I'm sure many of you when you walked into this courtroom when you were first called here for jury duty and you sat in those seats and you heard Judge Licari read the information and you heard that [the defendant] was charged with murder and two other charges involving weapons violations, I'm sure most of you if not all of you had that reaction. You're saying to yourself, holy mackerel, this guy, a seventy year old man and he's in here with a cane, and the fellow is charged with murder and two weapons violations. It's inconceivable. It's just inconceivable that someone who looks like this gentleman over here could be charged with that type of conduct. And I'm sure that probably was going through most of your minds. Don't be fooled by that. Don't be fooled by appearances. You know, let me ask you this, does anybody know, anybody of you, any one of you on this jury know what a so-called killer looks like? You know, if you look it up in a dictionary, you looked under killers, is it going to have a picture of a certain

type of individual? I think many of you have that proba-
bly stereotypical view that a killer is somebody who is
perhaps a young man, could be black or white, perhaps
someone who is muscular looking . . . might have
some tattoos, might have a very mean looking face,
may be even some scars here and there from gunshots
or knives or whatever, that's our typical view of what
a murderer looks like. Don't be fooled by appearances,
ladies and gentlemen. You know appearances are
deceiving. You cannot tell by looking at someone
whether or not they're a murderer. You simply can't do
that. I'd ask you to bear that in mind in this case. You
know, if you looked at [the defendant] when you first
walked in here, you probably said to yourself, geez, you
know, looks like a nice old guy, you know, seventy year
old guy was sitting there with a cane, he looks harmless,
he looks like he wouldn't hurt anybody, *but you heard
that he's been convicted of felonies three times. Three
times. Not once, not twice, but three times.* And this
is the same gentleman since—who since 1987 on almost
a continuous basis has illegally possessed countless
firearms. In fact, he's had so many firearms, he can't
even keep track of them. He can't remember where
they came from, who bought them or where they came
from." (Emphasis added.)

Even if we assume, arguendo, that the isolated refer-
ences to the defendant's three felony convictions were
inappropriate, the trial court's instructions to the jury
were more than sufficient to ensure that the defendant
was not denied a fair trial. During the trial, when the
defendant was asked on cross-examination about his
prior felony convictions, the trial court instructed the
jury as follows: "Ladies and gentlemen, I am allowing
that evidence in about prior felony convictions only on
the issue of credibility. I'll explain that to you later, *but
you cannot consider that evidence of prior convictions
as any evidence of any bad character on the part of*

*the defendant or any tendency on his part to commit criminal acts.* It is confined to credibility subject to the caveat I gave you earlier about one of those convictions being the predicate for one of the elements of one of the prior crimes." (Emphasis added.)

Then, in its final charge, the trial court stated: "During the course of this trial, there was testimony concerning previous felony convictions on the part of several witnesses including the defendant, that evidence was offered and admitted for one purpose only, to address the question of the credibility or believability of the witness. A witness' conviction of a prior felony may be weighed by you, the jury, in testing the credibility of the witness but for that purpose only. You are not required to disbelieve a witness because he has previously been convicted of a felony, it is simply something you may take into account in judging his credibility if you find that it bears at all on that credibility. . . . *You cannot consider any conviction of the defendant as evidence of bad character or of a tendency to commit criminal acts.*" (Emphasis added.)

We conclude that the challenged remarks, to the extent that they were inappropriate, were isolated and brief and did not reflect a pattern of misconduct in the context of the entire trial.

C

The defendant also claims that the prosecutor improperly appealed to the sympathy of the jury. We disagree.

During closing argument, the prosecutor remarked as follows: "You know, during this trial unfortunately [the victim] couldn't be here with us. [The defendant] made sure of that. And there's no question that over the years [the victim] had been involved in some things that no one of us can condone. She was involved in

domestic abuse, she obviously used alcohol to an excess and she was involved in drugs as well and none of us condone that, but you know something, ladies and gentlemen, despite all of those problems she doesn't deserve to be dead. She doesn't deserve—she didn't deserve to die at the hands of [the defendant]. You know, [the victim] for all her indiscretions paid the ultimate price in this case; she lost her life. She's not going to have the opportunity to get to [the defendant's] nice ripe old age of seventy years old, she's not going to have that opportunity. [The defendant] wants you to believe that he acted in self-defense and he wants you to acquit him of all the charges here, of all the charges. You know, this gives new meaning to the phrase three strikes you're out. He shot her twice before and now this is time number three and now he wants to try to convince you that he acted in self-defense and in this last shooting he killed her, not only just caused her injury, but he killed her."

A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. *State* v. *Watlington*, 216 Conn. 188, 193, 579 A.2d 490 (1990). Such appeals may cause the jury's attention to be diverted from its duty to decide the case on the evidence. *State* v. *Couture*, 194 Conn. 530, 562, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). A prosecutor may, however, present arguments with logical force and vigor. *State* v. *Sherman*, 38 Conn. App. 371, 401, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995). Our review of the challenged remarks leads us to conclude that they were not improper. Even if the challenged remarks were inappropriate because they were made as an appeal for sympathy for the victim, they were not egregious or part of a pattern of misconduct throughout the trial.

Any impropriety was offset by the trial court's final charge, in which it told the jury: "Certain things are not

evidence and you may not consider them in deciding what the facts are. These nonevidential things include: One, arguments and statements by the attorneys. The lawyers are not witnesses, what they have said during the course of the trial or in their closing arguments is intended to help you interpret the evidence, but it is not evidence. You should weigh and consider the arguments of counsel as to the facts, but if the facts as you remember them differ from the way I or the lawyers have stated them, your memory of them controls. If you believe that any attorney stated a personal opinion about the guilt or innocence of the defendant or about the credibility of any witness, you can disregard such opinions because they are exclusively yours to make."

The trial court also specifically instructed that the jury should not be "influenced by any sympathy for the accused, his family, for the victim or her family or for any other person who might in any way be affected by your decision." To the extent that the prosecutor's remarks may have been inappropriate, they did not deprive the defendant of a fair trial.

V

The defendant finally claims that his conviction for the use of a firearm in the commission of a class A, B or C felony in violation of General Statutes § 53-202k should be vacated. We agree.

In *State* v. *Dash*, 242 Conn. 143, 146, 698 A.2d 297 (1997), our Supreme Court addressed whether § 53-202k constituted a separate substantive offense, and concluded that it is only a sentence enhancement provision and not a separate offense of which a defendant could actually be convicted. The state concedes, and we agree, that *Dash* is controlling here and that the defendant's conviction under § 53-202k should be vacated. Accordingly, we remand the case to the trial

court to vacate that conviction and to resentence the defendant.

The defendant was sentenced as follows: manslaughter in the first degree—twenty years imprisonment, suspended after ten years, followed by three years probation; use of a firearm in the commission of a class A, B or C felony—five years imprisonment to run consecutively; and criminal possession of a firearm—two years imprisonment to run concurrently with count one. Accordingly, although the total effective sentence in this case was proper, it must be modified to reflect the fact that § 53-202k was not a separate offense. See *State* v. *Dash*, supra, 242 Conn. 150; *State* v. *Carter*, 47 Conn. App. 632, 649, 708 A.2d 213, cert. denied, 244 Conn. 909, 713 A.2d 828 (1998).

The judgment is reversed in part and the case is remanded with direction to vacate the defendant's conviction for use of a firearm in the commission of a class A, B or C felony in violation of General Statutes § 53-202k and to resentence the defendant for manslaughter in the first degree and criminal possession of a weapon to a total effective sentence of twenty-five years imprisonment, execution suspended after fifteen years, with three years of probation to follow. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.