******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* NICHOLAS J.
PAPANTONIOU
(AC 40554)

Lavine, Elgo and Bright, Js.

*Syllabus*

Convicted of the crimes of felony murder, burglary in the first degree and
criminal possession of a firearm in connection with the death of the
victim, the defendant appealed. He claimed, inter alia, that his rights
under article first, § 8, of the Connecticut constitution to be present at
trial and to confront the witnesses against him were violated when
the prosecutor made a generic tailoring argument during her closing
argument to the jury. The defendant and his accomplice, C, had driven
to the victim's apartment with the intent to rob him. A physical struggle
ensued, during which the victim was shot, cut and stabbed with a knife.
Investigators recovered a sweatshirt and a hat near the victim's body.
DNA evidence that was taken from the sweatshirt matched the defen-
dant's DNA profile, and the defendant's DNA and that of the victim were
found on the hat. The defendant was the final witness called by the
defense to testify at trial. His testimony conflicted in certain respects
with that of C, who had testified previously. The prosecutor stated
during her closing argument that the defendant had listened and had
access to all of the evidence that was presented to the jury, and that
he had attempted to create a story of his version of the events at issue
that fit all of the evidence. *Held*:

1. The defendant could not prevail on his unpreserved claim that the prosecu-
tor's alleged generic tailoring argument violated his rights under article
first, § 8, of the Connecticut constitution; the strength of the state's
case, standing alone, rendered the alleged error harmless beyond a
reasonable doubt, as the state presented an overwhelming case that
included, inter alia, DNA evidence, and testimony from C and the defen-
dant that the defendant was involved in the victim's death, the defendant
conceded on appeal that the evidence supported a conclusion that he
had held a pistol when it fired twice during the struggle with the victim,
and even if the prosecutor's remarks violated the defendant's state
constitutional rights, they did not influence the outcome of the trial.

2. The defendant failed to prove that certain of the prosecutor's remarks
during closing argument to the jury violated his rights to due process
and a fair trial; although the defendant did not invite the prosecutor's
comments suggesting that the firearm in the defendant's possession
could not have fired accidentally twice during the struggle with the
victim and that the defendant called his lawyer instead of calling 911
immediately after the shooting, defense counsel did not object to either
set of remarks, which were isolated, not egregious and did not concern
critical issues in the case, and the evidence of the defendant's guilt was
overwhelming, and even if the prosecutor's remarks were improper,
they were not so serious as to deprive the defendant of his rights to
due process and a fair trial.

3. The defendant could not prevail on his claim that the prosecutor's alleged
generic tailoring remarks deprived him of his general due process right
to a fair trial, as the strength of the state's case, standing alone, demon-
strated that the remarks, even if improper, were not so serious as to
deprive the defendant of his rights to due process and a fair trial;
moreover, defense counsel did not object to the prosecutor's remarks,
defense counsel's remarks to the jury invited the prosecutor to respond
by arguing that the defendant might have been trying to save himself
by concocting his story to the jury, the prosecutor's comments on the
defendant's presence at trial were limited to two brief instances during
her rebuttal argument and were not severe, the trial court instructed
the jury that arguments of counsel were not evidence, and the state's
case did not hinge on a credibility contest between C and the defendant,
as the jury reasonably could have inferred from the evidence, without
regard to C's testimony, that the defendant unlawfully had entered or
remained in the victim's apartment with the intent to rob him.

Argued April 10—officially released September 25, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, burglary in the first degree and criminal possession of a firearm, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Blue, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom were *Stacey M. Miranda*, senior assistant state's attorney, and, on the brief, *Patrick J. Griffin*, state's attorney, and *Karen A. Roberg*, assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Nicholas J. Papantoniou, appeals from the judgment of conviction, rendered following a jury trial, of felony murder in violation of General Statutes § 53a-54c, burglary in the first degree in violation of General Statutes § 53a-101 (a) (1), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). On appeal, the defendant claims that the state (1) violated his rights to be present at trial and to confront the witnesses against him under article first, § 8, of the Connecticut constitution[1] when the prosecutor made a "generic tailoring" argument during closing remarks, and (2) violated his constitutional rights to due process and a fair trial by committing prosecutorial improprieties. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. At approximately 12:30 p.m. on October 19, 2014, William Coutermash[2] drove to 397 Circular Avenue in Hamden; the defendant accompanied him. Larry Dildy, the victim, lived in the second floor apartment of a multifamily house located at 397 Circular Avenue with his wife, Vivian Dildy (Vivian), and their daughter, Ashante Dildy (Ashante). The victim was a known drug dealer, and according to Coutermash, he and the defendant went to the victim's apartment with the intent to rob him.[3] More specifically, Coutermash said the plan was to "flash a gun in the [victim's] face" in an attempt to "get either drugs or money" from him.

When Coutermash and the defendant arrived, Coutermash parked his vehicle—a black Jeep with New York license plates—near the victim's driveway and handed the defendant gloves and a handgun. According to Coutermash, the defendant then exited the vehicle "to get drugs or money" and also was armed with a knife.[4] The defendant, who was wearing a gray sweatshirt, a tan hat, and sunglasses, then proceeded to the back door of the victim's apartment. Coutermash testified that he stayed in his Jeep.

Vivian was home at the time, and according to her, one "intruder" entered the apartment through the apartment's locked back door after the force of his knocking opened it. She described the intruder as wearing a grey "sweat jacket" and a yellow or beige hat. Shortly thereafter, Vivian saw the lone intruder pointing a gun at the victim, heard him say something that "sounded like give it up," and called 911 at her husband's request. Ashante, who was hiding in her room when the intruder entered the apartment, also heard a single, "raspy" male voice say that "he needed the $400 and the pill," and overheard her father respond that "[he] didn't have it." After the victim and the intruder argued for a period of time, a physical fight ensued, and the two men struggled over

the intruder's gun. During the struggle, the victim pulled off the intruder's sweatshirt, and Vivian struck the intruder over the head with a broom handle before she ran to a separate room. Vivian then heard two gunshots,[5] and the intruder quickly fled the apartment.

Minutes after the defendant had exited the Jeep, Coutermash observed emergency personnel arriving and decided to drive away from the area. As he did so, he encountered the defendant on a nearby street, picked him up, and the two left the scene. The victim had been shot, cut, and stabbed multiple times during the altercation; he was taken to a hospital and died from his injuries.

During the ensuing police investigation, investigators recovered various items located on the floor near the victim's body, including a grey hooded sweatshirt, a tan hat, sunglasses, and a knife. Subsequent scientific testing revealed that DNA[6] evidence taken from the grey sweatshirt matched the defendant's DNA profile, which was contained in a national database of DNA.[7] That same testing eliminated Coutermash as a source of the DNA found on the grey sweatshirt. Scientific testing of the tan hat also revealed the presence of both the defendant's and the victim's DNA.[8] Finally, surveillance cameras near the victim's apartment captured the defendant discarding gloves and a handgun shortly after the shooting.[9]

By way of an amended long form information, the state charged the defendant with felony murder, burglary in the first degree, and criminal possession of a firearm.[10] Following the jury's verdict of guilty on all counts, the trial court rendered judgment and sentenced the defendant to a term of imprisonment of forty-five years on the felony murder conviction, a concurrent sentence of twenty years imprisonment on the burglary conviction, and a concurrent sentence of ten years imprisonment on the criminal possession of a firearm conviction, for a total effective sentence of forty-five years imprisonment. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that the state violated his rights to be present at trial and to confront the witnesses against him. He argues that the state violated these *specific* constitutional rights when the prosecutor made a "generic tailoring"[11] argument during closing remarks to the jury. He concedes that the state is permitted to make such an argument under the federal constitution,[12] but according to him, the state may not do so in accordance with article first, § 8, of the Connecticut constitution.[13] He did not assert this claim at trial and therefore raises it under the familiar rubric of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823

(1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). In response, the state contends that the defendant's unpreserved constitutional claim fails to satisfy both the third and fourth prongs of *Golding*. Because we conclude that the alleged constitutional violation, if any, was harmless beyond a reasonable doubt, we agree that the defendant's claim fails to satisfy *Golding*'s fourth prong.[14]

The following additional facts and procedural history are relevant to this claim. The defendant testified at trial and was the final witness called by the defense. His testimony, in certain respects, conflicted with Coutermash's testimony. According to Coutermash, the victim did not owe him money, and he remained in his Jeep when the defendant went to the victim's apartment. The defendant testified that, on October 19, 2014, Coutermash told him that he needed to "collect some money" from someone. See footnote 3 of this opinion. In contrast to Coutermash, the defendant claimed that when he and Coutermash arrived at 397 Circular Avenue, both of them entered the victim's apartment, and Coutermash demanded $400 from the victim. The defendant testified that he entered the victim's apartment only after Coutermash and the victim began fighting and when things were "getting out of control . . . ." Upon entering the apartment, the defendant told the victim: "[L]isten, just give [Coutermash] his money—you know—let me get the hell out of here, just give him what you owe him, it's gone far enough, it's out of control, just give him his money, you know." The defendant further testified that, immediately after he told the victim to give Coutermash money, Coutermash fled the apartment. At that point, the defendant claimed that the victim charged at him, the two began to struggle over the gun in his hand, and the gun "went off" twice during the struggle.

During closing argument, counsel for the defendant began by stating that "this case . . . comes down to two witnesses, really, [the defendant] and [Coutermash]. They told two divergent stories, and the state told you that they're relying on . . . Coutermash." Counsel for the defendant also argued in relevant part: "Now, we talked a little about this a little while ago, that is, that the state goes second. I have to do my best to anticipate their arguments. The state is very creative; I'm sure I will not think of everything they're going to think of. So, here's some food for thought. They may argue that [the defendant] is trying to save himself by concocting this story. My response to that is, refer back to the undisputed evidence. Which version is a concoction, and which one is closer to reality, based on the evidence?"

The prosecutor then opened her rebuttal argument by stating in relevant part: "So, the defendant wants you to believe—or disbelieve every single thing you

heard, except the defendant. Disbelieve all of it, and certainly ignore the actual eyewitness to this because her version doesn't fit what we're trying to do here. Her version doesn't fit what we're trying to tell you.

"*Keep in mind, the defendant has had access to all of the evidence, all of the testimony, all of the photographs, every single piece of information that was presented to you,* [and] *the defendant was able to sit there and listen to and come up with his version.*

"The defense attorney asked all of you on voir dire, and he just asked you again, whether you believe that someone can lie to gain a benefit. Do you? You all said yes. Who has the biggest benefit to gain here at this moment? Don't you find it very convenient that the defendant's story is that he was just a mere bystander in all of this? He was forced to come up by [Coutermash], his friend, who just wanted him to have his back, so he did. . . .

"He attempts to create a story that fits all of the evidence, and his attempts at that you can't deny is flawed. He gets an A for effort, but it's not going to work because the evidence shows you that this version makes zero sense." (Emphasis added.)

The defendant contends that the prosecutor's remarks during rebuttal amounted to a "generic tailoring" argument that violated his state constitutional rights. He seeks review of his unpreserved state constitutional claim under *State* v. *Golding*, supra, 213 Conn. 233. "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) Id., 239–40.

Even if we assume, without deciding, that the defendant could meet the factors set forth in *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), to demonstrate that the alleged constitutional violation occurred; see footnote 13 of this opinion; we nevertheless conclude that the state has proved that the alleged constitutional violation was harmless beyond a reasonable doubt. "[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with

the [f]ederal [and state] [c]onstitution[s], be deemed harmless, not requiring the automatic reversal of the conviction. . . . The state has the burden to prove that this error was harmless beyond a reasonable doubt. . . . The focus of our harmless error inquiry is whether the state has demonstrated that the otherwise improper comments did not influence the outcome of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *A. M.*, 324 Conn. 190, 204, 152 A.3d 49 (2016); see also *State* v. *Cassidy*, 236 Conn. 112, 129, 672 A.2d 899 (impermissible "generic tailoring" argument subject to harmless error), cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled in part on other grounds by *State* v. *Alexander*, 254 Conn. 290, 299–300, 755 A.2d 868 (2000).

The state argues that the alleged violation was harmless because the "overwhelming evidence of guilt [demonstrates] there is no reasonable doubt that the jury would have convicted the defendant of all three offenses—felony murder, burglary, and criminal possession of a firearm—with or without the prosecution's [generic] tailoring argument during rebuttal." We agree that the strength of the state's case against the defendant, standing alone, renders the alleged error harmless beyond a reasonable doubt.[15]

Having thoroughly reviewed the record, we do not believe that the prosecutor's alleged "generic tailoring" argument had any discernible effect on the outcome of the trial. The state presented an overwhelming case against the defendant.[16] The DNA evidence and testimony from both Coutermash and the defendant demonstrate that the defendant was involved in the victim's death. In fact, the defendant concedes on appeal that "[t]he evidence supports a conclusion that [he] was in the apartment and held the pistol while struggling with [the victim] when it fired twice."

According to Coutermash, on October 19, 2014, the two men intended to rob the victim of either drugs or money by flashing a gun in his face. The defendant also testified that he "was looking to get a few bucks" when he traveled with Coutermash to the victim's apartment. See footnote 3 of this opinion. The defendant's testimony regarding what occurred on October 19, 2014, differed from Coutermash's account, as the defendant said that *both* he and Coutermash entered the victim's apartment. Nevertheless, the defendant testified that he told the victim to "just give [Coutermash] his money . . . just give him what you owe him . . . ." after the defendant had entered the victim's apartment with a gun in his hand. Under either version of events—the defendant's or Coutermash's—the jury reasonably could have concluded that the defendant entered the victim's apartment with the intent to commit a forceful taking; see General Statutes § 53a-133; and that the victim was shot during the ensuing struggle.

Additionally, Vivian and Ashante both testified that a lone intruder demanded money and pills from the victim before struggling with and shooting him. According to Vivian, the intruder wore a grey "sweat jacket" and a yellow or beige hat. DNA evidence found on the grey sweatshirt and tan hat found next to the victim's body directly connected the defendant to the shooting, and he even testified at trial that the gun discharged while he struggled with the victim. Vivian also testified that the lone intruder entered through the locked back door after he forcefully banged on it, and that she heard him say something that "sounded like give it up," and attacked him with a broom handle and called 911. All of this is compelling evidence that the defendant was armed with a gun when he unlawfully entered the victim's apartment with the intent to rob the victim and that the victim died as a result of the incident. The state therefore presented a very strong case against the defendant. See footnote 16 of this opinion. Moreover, Vivian and Ashante corroborated Coutermash's testimony that the defendant entered the victim's apartment alone with the intent to take either drugs or money from the victim at gunpoint. Cf. *State v. Cassidy*, supra, 236 Conn. 131 (state failed to prove that improper remarks were harmless because, inter alia, "the state's case rested entirely upon the uncorroborated testimony of the victim"); *State* v. *Carter*, 47 Conn. App. 632, 648, 708 A.2d 213 (even assuming that prosecutor's remarks were improper under *Cassidy*, they were harmless beyond reasonable doubt because "the state's case did not rest entirely on the uncorroborated testimony of a single victim"), cert. denied, 244 Conn. 909, 713 A.2d 828 (1998).

Even if we assume solely for the sake of argument that the prosecutor's remarks during rebuttal violated the defendant's rights under article first, § 8, of the Connecticut constitution, we do not believe that they influenced the outcome of the trial. The state has proved that the error, if any, was harmless beyond a reasonable doubt. Accordingly, the defendant's claim fails under the fourth prong of *Golding*.[17]

## II

The defendant's second claim is that the state violated his rights to due process and a fair trial when the prosecutor committed three separate improprieties during her closing remarks to the jury.[18] He argues that the prosecutor asserted facts not in evidence, misstated the evidence that was actually introduced, and improperly undermined his credibility. He contends that his credibility was "the central issue in this case," and that such improprieties were harmful because they undermined his credibility and suggested that he possessed a guilty conscience. The state, on the other hand, argues that the arguments by the prosecutor were not improper and, even if they were improper, they did not deprive

the defendant of his rights to due process and a fair trial. We conclude that, even if we were to assume, without deciding, that the challenged comments were improper, the defendant failed to prove that they deprived him of his rights to due process and a fair trial.

The following additional procedural history is relevant to this claim. During the state's rebuttal argument, the prosecutor made three sets of comments that the defendant claims amounted to prosecutorial impropriety. The first set of comments relates to the prosecutor's characterization of the testimony from Douglas Fox, a firearms expert who testified on behalf of the state, and how the defendant must have chambered two rounds in the gun in his possession before intentionally pulling the trigger. During her rebuttal, the prosecutor argued in relevant part: "[Fox] . . . explained to you how [the handgun used to shoot the victim] works, which is extremely important. You will determine that his testimony is important because he told you that firing that weapon takes a purposeful, physical action to make that weapon able to be fired. If you recall, he showed you that weapon, he showed you that you have to pull that slide back. *That doesn't happen by accident. Those are not accidental movements, and it's certainly not accidental twice*." (Emphasis added.) She also argued: "[While the victim] is attacking [the defendant] . . . and struggling, struggling, struggling, and by accident the gun goes off—twice. [The defendant claims he] [d]idn't pull the trigger intentionally, certainly didn't pull the slide back intentionally, all accidental. Ask yourselves, ladies and gentlemen, does this story make any sense whatsoever?"

The second set of comments relates to the prosecutor's characterization of the defendant's conduct immediately after the victim was shot. During her rebuttal, the prosecutor argued in relevant part: "[The defendant claimed] he was so concerned about all of the injuries, on how bad [the victim] was hurt, and the blood and he felt horrible. What did he do as soon as he left? Did he call 911—this is an accident, according to him. Did he call 911 and get him help? *Do you recall what he said? He called his lawyer*." (Emphasis added.)

The third and final set of comments are those previously set forth in part I of this opinion concerning the defendant's presence at trial and his corresponding opportunity to generally tailor his testimony.

We now set forth the relevant legal principles governing our review. It is often said that " '[w]hile [the prosecutor] may strike hard blows, [s]he is not at liberty to strike foul ones. It is as much [her] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' " *State* v. *Rowe*, 279 Conn. 139, 159, 900 A.2d 1276 (2006), quoting *Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

Although the defendant did not object to the remarks he challenges on appeal, we still review his claims because "a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of [*Golding*], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . .

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: [1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . [6] and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 560–61. "The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 700, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271, 272 (2014). "Under the *Williams* general due process standard, the defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense." *State* v. *A. M.*, supra, 324 Conn. 199.

"The two steps of [our] analysis are separate and distinct, and we may reject the claim if we conclude that the defendant has failed to establish either prong." *State* v. *Danovan T.*, 176 Conn. App. 637, 644, 170 A.3d 722 (2017), cert. denied, 327 Conn. 992, 175 A.3d 1247 (2018); see also *State* v. *Aviles*, 154 Conn. App. 470, 486, 106 A.3d 309 ("[b]ecause we assume, without deciding, that the challenged comments were improper, we move directly to the second step of the analysis and address whether the prosecutor's remarks were harmful"), cert. denied, 316 Conn. 903, 111 A.3d 471 (2015).

The defendant claims that each of the three separate sets of comments by the prosecutor deprived him of his rights to due process and a fair trial. With respect to the first set of remarks, the defendant argues that the prosecutor improperly suggested that the firearm in his possession could not have fired accidentally twice during his struggle with the victim. According to the defendant, the prosecutor improperly "implie[d] that the defendant had to pull the slide [of the gun] back before each shot, and had to pull the trigger intentionally twice." As to the second set of remarks, the defendant contends that the state improperly argued that, instead of calling 911 immediately after the shooting, he chose to call his lawyer. His argument for this set of remarks is twofold. First, he maintains that the state "implie[d] that [he] had the means to call 911 at or shortly after leaving [the victim's] house, a fact not in evidence," and second, that "[i]t also implie[d] that [he] called his lawyer as soon as he left." According to him, the state's remarks "both misstated the evidence and implied that only guilty people call their lawyers." Finally, as an alternative to his claim presented in part I of this opinion, the defendant reframes the prosecutor's "generic tailoring" remarks as a *general* prosecutorial impropriety claim. Even if we assume, without deciding, that these remarks were improper, on the basis of our evaluation of the *Williams* factors, we conclude that the defendant has failed to prove that he was deprived of his rights to due process and a fair trial.[19]

A

First and Second Sets of Remarks

With respect to the first and second set of remarks, we initially note that trial counsel for the defendant did not invite either set of remarks by the prosecutor. The first *Williams* factor therefore favors the defendant. At the same time, however, the remarks were not severe enough to influence the jury improperly. Defense counsel did not object to either set of remarks at trial, and "it [is] highly significant that defense counsel failed to object to any of the improper remarks, request curative instructions, or move for a mistrial." *State* v. *Thompson*, 266 Conn. 440, 479, 832 A.2d 626 (2003); see also *State* v. *Payne*, supra, 303 Conn. 568 ("[w]hen no objection is raised at trial, we infer that defense counsel did not regard the remarks as 'seriously prejudicial' at the time the statements were made"). The second *Williams* factor favors the state.

The allegedly improper remarks were also isolated. The prosecutor's remarks regarding the firearm occurred twice during a lengthy rebuttal argument. See, e.g., *State* v. *Ross*, supra, 151 Conn. App. 701 (frequency factor under *Williams* favored state where "the claimed improprieties were not pervasive throughout the trial, but were confined to, and constituted only a small por-

tion of, closing and rebuttal argument"). As for the remarks on the defendant's call to his lawyer, the prosecutor, during cross-examination, asked a *single, follow up* question regarding the defendant's statement that he called his lawyer after he shot the victim;[20] at the end of her closing, the prosecutor made a passing reference to that call. Cf. *State* v. *Angel T.*, 292 Conn. 262, 290–91, 973 A.2d 1207 (2009) (state improperly addressed defendant's decision to seek aid of counsel prior to arrest by eliciting evidence through two witnesses and "then discussed the evidence at length during both its opening and rebuttal summations"). Nor do we view any of these remarks as egregious under the circumstances. See *State* v. *Thompson*, supra, 266 Conn. 480 ("[g]iven the defendant's failure to object, only instances of grossly egregious [impropriety] will be severe enough to mandate reversal"). The third *Williams* factor weighs in favor of the state.

It is also significant that neither set of alleged improprieties went to critical issues in the case. Because the defendant was charged with felony murder, his *intent* to shoot or murder the victim was not at issue. See, e.g., *State* v. *Johnson*, 165 Conn. App. 255, 269–70, 138 A.3d 1108 (no requirement under felony murder statute that defendant intend to murder victim; state need only prove death in course of and furtherance of felony), cert. denied, 322 Conn. 904, 138 A.3d 933 (2016). The prosecutor's remarks about whether chambering a round in the defendant's handgun or firing it was "accidental" therefore did not go to a critical issue in the case. Nor did the state's case require that it prove that the defendant possessed a guilty conscience. See *State* v. *Montoya*, 110 Conn. App. 97, 109, 954 A.2d 193 (prosecutor's statements were not central to critical issue in case where subject of statements "was not an element of [the charged offense]"), cert. denied, 289 Conn. 941, 959 A.2d 1008 (2008). Moreover, contrary to the defendant's claim on appeal, the state's case against the defendant did not hinge on a credibility contest between him and Coutermash. Cf. *State* v. *Angel T.*, supra, 292 Conn. 290 (state's case "turned largely" on credibility contest between defendant and victim "and the impropriety gave the clear impression that the defendant, who was not speaking to the police and had retained an attorney in connection with the investigation, had something to hide"). The fourth *Williams* factor favors the state.

With respect to the fifth *Williams* factor, the defendant's failure to object at trial deprived the court of the opportunity to adopt tailored curative measures. See, e.g., *State* v. *Ross*, supra, 151 Conn. App. 702 ("by failing to bring [the claimed improprieties] to the attention of the trial court, [the defendant] bears much of the responsibility for the fact that these claimed improprieties went uncured" [internal quotation marks omitted]). The court, nonetheless, did instruct the jury that argu-

ments of counsel were not evidence. See *State* v. *Montoya*, supra, 110 Conn. App. 110 ("[w]hen [any] impropriety is brief and isolated . . . the court's general instructions to the jury to decide the case on the facts before it and not on the arguments of counsel serve to minimize harm from impropriety"). The fifth *Williams* factor therefore weighs in favor of the state.

Finally, the sixth *Williams* factor weighs heavily in favor of the state. The evidence of guilt was overwhelming. This factor, standing alone, is sufficient to demonstrate that the remarks of the prosecutor, even if we assume for the sake of analysis that they were improper, were not so serious as to deprive the defendant of his rights to due process and a fair trial. See, e.g., *State* v. *Aviles*, supra, 154 Conn. App. 487–88 (strength of state's case against defendant can outweigh other *Williams* factors favoring defendant). Accordingly, we conclude that in the context of the entire trial, the defendant has failed to prove that the first and second sets of challenged remarks deprived him of his rights to due process and a fair trial.

B

"Generic Tailoring" Remarks

As an alternative to his claim presented in part I of this opinion, the defendant reframes his challenge to the prosecutor's "generic tailoring" remarks as a claim that these remarks deprived him of his *general* due process right to a fair trial. See, e.g., *State* v. *A. M.*, supra, 324 Conn. 198–99; *State* v. *Payne*, supra, 303 Conn. 562–63. We initially note that defense counsel did not object to the prosecutor's purported "generic tailoring" remarks. See, e.g., *State* v. *Payne*, supra, 568; cf. *State* v. *Cassidy*, supra, 236 Conn. 122, 132 (defendant moved for mistrial and requested curative instructions in response to prosecutor's generic tailoring argument).

Additionally, in part I of this opinion, we discussed the strength of the state's case against the defendant. See *State* v. *Payne*, supra, 303 Conn. 561 (sixth *Williams* factor is "the strength of the state's case" [internal quotation marks omitted]). This factor, standing alone, demonstrates that the remarks of the prosecutor, even if we assume for the sake of analysis that they were improper, were not so serious as to deprive the defendant of his rights to due process and a fair trial. See, e.g., *State* v. *Aviles*, supra, 154 Conn. App. 487–88.

The other *Williams* factors also weigh in favor of the state. As to the first *Williams* factor, defense counsel stated during closing argument in relevant part: "I have to do my best to anticipate [the state's] arguments. . . . [*The state*] *may argue that* [*the defendant*] *is trying to save himself by concocting this story.* My response to that is, refer back to the undisputed evidence. Which version is a concoction, and which one is closer to

reality, based on the evidence?" (Emphasis added.) Defense counsel's remarks, even if to a slight degree, invited the prosecutor to respond by arguing how the defendant might be "trying to save himself by concocting [his] story" to the jury. See, e.g., *State* v. *Payne*, supra, 303 Conn. 567 (defense counsel's comments on defendant's credibility invited state's attack on defense counsel's ethics).

The prosecutor's comments on the defendant's presence at trial—i.e., "to sit there and listen to and come up with his version [of events]"—were limited to two brief instances during her rebuttal[21] and were not severe. Cf. *State* v. *A. M.*, supra, 324 Conn. 206 (remarks by prosecutor were "particularly severe" because prosecutor violated General Statutes § 54-84 [a] by explicitly commenting on defendant's failure to testify). Additionally, the trial court instructed the jury that arguments of counsel were not evidence. See *State* v. *Payne*, supra, 303 Conn. 567 ("the trial court cured any harm by instructing the jury that the arguments of counsel were not evidence on which the jurors could rely"); see also *State* v. *Collins*, 299 Conn. 567, 590, 10 A.3d 1005 ("[w]e presume the jury . . . followed [the court's instruction] in the absence of any indication to the contrary"), cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). Thus, the second, third, and fifth *Williams* factors weigh in favor of the state.

Finally, although the defendant's credibility was important to the jury's resolution of the case, the state's case did not hinge on a credibility contest between Coutermash and the defendant.[22] Cf. *State* v. *A. M.*, supra, 324 Conn. 211–13 (state's case against defendant, accusing him of committing various sexual assault and risk of injury to child offenses, rested entirely on victim's credibility; prosecutor's improper remarks bolstered victim's credibility and diminished defendant's credibility). Coutermash testified that both men went to the victim's home with the intent to rob him. See, e.g., *State* v. *Pranckus*, 75 Conn. App. 80, 87–88, 815 A.2d 678 ("[i]t is the [jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses" [internal quotation marks omitted]), cert. denied, 263 Conn. 905, 819 A.2d 840 (2003). At the same time, the defendant testified that he went to the victim's apartment "looking to get a few bucks" and, after entering the apartment with a gun in his hand, told the victim to "just give [Coutermash] his money . . . ." According to Vivian and Ashante, a lone intruder entered their apartment and demanded that the victim hand over money and pills. Scientific testing revealed that the defendant's DNA was on both the grey sweatshirt and the tan hat recovered next to the victim's body. On the basis of the defendant's own testimony, the testimony from Vivian and Ashante, and the scientific evidence, the jury reasonably could have inferred—without regard to Coutermash's testimony—that the defendant

unlawfully entered or remained in the victim's apartment with the intent to rob him. See, e.g., *State* v. *Thompson*, supra, 266 Conn. 483 (fourth and fifth *Williams* factors weighed in favor of state because "[that case was] not a case that rested solely on the credibility of witnesses"); *State* v. *Carter*, supra, 47 Conn. App. 648 (even if prosecutor's remarks were improper under *Cassidy*, they were harmless beyond reasonable doubt because, inter alia, defendant's credibility "was not critical due to the existence of independent evidence of the crime"). Accordingly, we conclude that in the context of the entire trial, the defendant has failed to prove that the challenged "generic tailoring" remarks deprived him of his rights to due process and a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Article first, § 8, of the constitution of Connecticut, as amended by articles seventeen and twenty-nine of the amendments, provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . [and] to be confronted by the witnesses against him . . . . No person shall be compelled to give evidence against himself, nor be deprived of . . . liberty . . . without due process of law . . . ."

[2] The state charged Coutermash with various crimes in connection with the victim's death. Prior to the defendant's trial, Coutermash pleaded guilty to accessory to manslaughter in the first degree and accessory to burglary in the first degree. He testified on behalf of the state pursuant to a cooperation agreement.

[3] During direct examination, the defendant testified that, on October 19, 2014, Coutermash told him to "[t]ake a ride with me; I gotta go collect some money" but that Coutermash did not say from whom he was going to be collecting money. On cross-examination, the defendant also testified that "[Coutermash] told me [that] he had to collect some money and if he got it he would throw me a few bucks," and agreed that he "was looking to get a few bucks" when he went to the victim's apartment. Coutermash denied going to the victim's apartment "to collect a $400 debt" and testified that the victim did not owe him money.

[4] James Samperi, Jr., a witness for the state who was familiar with the defendant, also testified that the defendant occasionally carried a knife.

[5] During direct examination, the defendant admitted to struggling with the victim over the gun in his possession and that the gun "went off" twice during the struggle.

[6] "DNA stands for deoxyribonucleic acid and comprises a person's inherited genetic material." *State* v. *Aviles*, 154 Conn. App. 470, 483 n.4, 106 A.3d 309 (2014), cert. denied, 316 Conn. 903, 111 A.3d 471 (2015).

[7] Investigators cross-referenced the DNA retrieved from the grey sweatshirt with DNA contained in the CODIS database, a national repository of DNA for convicted felons. See, e.g., *State* v. *Webb*, 128 Conn. App. 846, 852–83 n.3, 19 A.3d 678 (generally describing national CODIS database), cert. denied, 303 Conn. 907, 32 A.3d 961 (2011).

[8] Lana Ramos, an employee of the state forensics laboratory, testified that testing the evidence from the tan hat revealed a mixture of DNA in which the victim and the defendant "are included as contributors to the DNA profile [from the second swab of the tan hat]." According to Ramos, "[t]he expected frequency of individuals who could be a contributor to the DNA profile from [the second swab of the tan hat] is approximately 1 in 4.6 million in the African-American population; approximately 1 in 2.6 million in the Caucasian population; and approximately 1 in 3.8 million in the Hispanic population."

[9] At trial, both Samperi and Jason Marini, who also was familiar with the defendant and testified on behalf of the state, identified the defendant as the individual observed in the surveillance footage.

[10] During closing argument, trial counsel for the defendant conceded that the defendant was guilty of criminal possession of a firearm.

[11] "Generic tailoring arguments occur when the prosecution attacks the

defendant's credibility by simply drawing the jury's attention to the defendant's presence at trial and his resultant opportunity to tailor his testimony." *Martinez* v. *People*, 244 P.3d 135, 141 (Colo. 2010).

[12] Our Supreme Court previously held that such arguments violated a defendant's sixth amendment rights under the federal constitution. See *State* v. *Cassidy*, 236 Conn. 112, 127–28, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled in part by *State* v. *Alexander*, 254 Conn. 290, 299–300, 755 A.2d 868 (2000). Following the decision by the United States Supreme Court in *Portuondo* v. *Agard*, 529 U.S. 61, 67–69, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000), however, our Supreme Court reversed its holding in *Cassidy*. See *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000).

[13] The defendant argues, in accordance with *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992), that the Connecticut constitution provides greater protection than the federal constitution with respect to "generic tailoring" arguments. See id., 684–86 (setting forth six factors courts consider when determining whether state constitution provides greater protection than federal constitution).

[14] Both parties address this claim under the framework of *Golding*, so we follow their lead. We note, however, that a defendant generally does not need to satisfy the four-pronged *Golding* test to prevail on a prosecutorial impropriety claim. See *State* v. *A. M.*, 324 Conn. 190, 198 n.2, 152 A.3d 49 (2016); *State* v. *Payne*, 303 Conn. 538, 560, 34 A.3d 370 (2012). Where a defendant claims that prosecutorial impropriety infringed a specifically enumerated constitutional right, "the defendant initially has the burden to establish that a constitutional right was violated. . . . If the defendant establishes the violation, however, the burden shifts to the state to prove that the violation was harmless beyond a reasonable doubt." (Citation omitted.) *State* v. *A. M.*, supra, 199. The test is the functional equivalent of applying *Golding*'s third and fourth prongs. We do not decide whether the defendant has demonstrated that a constitutional violation exists on this record. We assume, simply for the sake of argument, that the defendant met his burden and conclude that the state has demonstrated that the alleged violation was harmless beyond a reasonable doubt. Furthermore, because we assume, without deciding, that the state's alleged "generic tailoring" argument violated the defendant's rights under the state constitution, we do not address the *Geisler* factors.

Additionally, we note that, on June 21, 2018, *State* v. *Weatherspoon*, AC 40651, was transferred to our Supreme Court. The defendant in *Weatherspoon* also raises the issue of whether article first, § 8, of the Connecticut constitution prohibits "generic tailoring" arguments. See *State* v. *Weatherspoon*, SC 20134.

[15] We limit our analysis to the state's argument that the overwhelming evidence of guilt renders the constitutional violation, if any, harmless beyond a reasonable doubt. In similar circumstances, after concluding that the prosecutor, during rebuttal, violated a defendant's rights under the fifth amendment to the federal constitution, our Supreme Court applied the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), to determine whether the state proved that such violation was harmless beyond a reasonable doubt. See *State* v. *A. M.*, supra, 324 Conn. 205. Nonetheless, the court noted that "[it was] *not* required to do a complete *Williams* analysis *due to the nature of the right infringed*"; (emphasis added) id.; and that "the *Williams* standard applies only when a defendant claims that a prosecutor's conduct did not infringe on a specific constitutional right, but nevertheless deprived the defendant of his general due process right to a fair trial." Id., 199, citing *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012).

[16] With respect to the felony murder charge, "[f]elony murder occurs when, in the course of and in furtherance of another crime, one of the participants in that crime causes the death of a person who is not a participant in the crime. . . . The two phrases, in the course of and in furtherance of, limit the applicability of the statute with respect to time and causation. . . . The phrase in the course of focuses on the temporal relationship between the murder and the underlying felony. . . . We previously have defined the phrase in the course of for purposes of § 53a-54c to include the period immediately before or after the actual commission of the crime . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Johnson*, 165 Conn. App. 255, 290–91, 138 A.3d 1108, cert. denied, 322 Conn. 904, 138 A.3d 933 (2016); see also General Statutes § 53a-54c. The state accused the defendant of committing burglary as the underlying felony for this charge,

and alleged that "in the course of and in furtherance of such crime, he or another participant caused the death of [the victim] . . . ."

With respect to the burglary in the first degree charge, "[a] person is guilty of burglary in the first degree when . . . such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with . . . a deadly weapon . . . ." General Statutes § 53a-101 (a) (1).

Finally, § 53a-217 provides in relevant part: "(a) A person is guilty of criminal possession of a firearm . . . when such person possesses a firearm . . . and (1) has been convicted of a felony committed prior to, on or after October 1, 2013, or of a violation of section 21a-279, 53a-58, 53a-61, 53a-61a, 53a-62, 53a-63, 53a-96, 53a-175, 53a-176, 53a-178 or 53a-181d committed on or after October 1, 2013 . . . ." As previously stated, counsel for the defendant conceded during closing argument that the defendant was guilty of criminal possession of a firearm. See footnote 10 of this opinion.

[17] The defendant alternatively argues that we should "prohibit generic tailoring" arguments under our supervisory authority "and . . . apply that ruling to [the present] case." "[A]n appellate court may invoke its supervisory authority [over the administration of justice] to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . Such a sanction generally is appropriate, however, only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 485, 832 A.2d 626 (2003). We conclude that this is not an appropriate case for our supervisory authority because we do not believe that the prosecutor's arguments in the present case, even if assumed for the sake of argument to have been improper, were so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal. Cf. *State* v. *Payne*, 260 Conn. 446, 463, 797 A.2d 1088 (2002); id., 466 (reversing conviction under supervisory authority where prosecutor committed numerous improprieties, which were part of pattern of misconduct throughout closing argument, in disregard of trial court rulings; "[m]erely to reprimand a prosecutor [under such circumstances] would not sufficiently convey our strong disapproval of such tactics").

We also conclude that the defendant cannot prevail on his claim of plain error. The defendant concedes that his fully briefed state constitutional claim "is an issue of first impression" and that the prosecutor's "generic tailoring" argument is permissible under the federal constitution. See *State* v. *Alexander*, supra, 254 Conn. 299–300. The alleged error therefore is not "plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable." (Internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 596, 134 A.3d 560 (2016); see also *State* v. *Fagan*, 280 Conn. 69, 88, 905 A.2d 1101 (2006) (defendant's plain error claim addressing sentence enhancement under General Statutes § 53a-40b presented issue of first impression and, therefore, Supreme Court "[could not] conclude that the trial court committed a clear and obvious error by exercising its discretion under the express provisions of a presumptively valid statute"), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007). Nor is the alleged error "so harmful or prejudicial that it resulted in manifest injustice." *State* v. *Jamison*, supra, 599. This is especially so where the state presented overwhelming evidence of guilt, and its case did not hinge on a credibility contest between the defendant and Coutermash. See *State* v. *Sanchez*, 308 Conn. 64, 84, 60 A.3d 271 (2013) ("[t]o find plain error without regard to the evidence in the case would be inconsistent with the requirement of showing manifest injustice").

[18] The defendant generally asserts that "[i]f this court concludes that the state committed improprieties in its closing argument, it then considers whether the defendant was deprived of his federal *and state* rights to due process and [a fair trial]." (Emphasis added.) The defendant does not independently analyze this claim under the state constitution. We therefore deem any state constitutional claim abandoned. See, e.g., *State* v. *Bennett*, 324 Conn. 744, 748 n.1, 155 A.3d 188 (2017).

[19] Our opinion should not be understood to suggest in any way that the prosecutor committed impropriety at any time during her rebuttal. We recognize that "[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of

counsel in the heat of argument." (Internal quotation marks omitted.) *State v. Thompson*, 266 Conn. 440, 458, 832 A.2d 626 (2003). We simply assume, solely for the sake of argument, that the prosecutor's remarks were improper.

[20] In relevant part, the prosecutor cross-examined the defendant as follows:

"Q. All right. Did you call 911 when you left [the victim's apartment], sir?

"A. No, I called my lawyer.

"Q. You called your lawyer?

"A. Not right afterward, but after I found out about the warrant.

"Q. When—

"A. Not Glenn Conway.

"Q. My question is, when you were so upset about [the victim] being shot, did you call 911?

"A. No."

The prosecutor did not revisit the defendant's call to his lawyer during cross-examination.

[21] In addition to the remarks referenced in part I of this opinion, the prosecutor, when comparing the testimony of Coutermash and the defendant, also argued in relevant part: "[The defendant] had the opportunity to look at all of this evidence here. . . . Coutermash didn't have that opportunity."

[22] The defendant argues on appeal that "[t]his case was largely a credibility contest between Coutermash and [him]." According to the defendant, "[he] entered [the victim's] house to stop the fight [between Coutermash and the victim], *without an intent to commit a felony*, and was [therefore] not guilty of burglary or felony murder." (Emphasis added.) In other words, he focuses his argument on what the state needed to prove with respect to the burglary charge by contending that he did not enter or remain in the victim's apartment with *an intent* to commit a crime. See General Statutes § 53a-101 (a) (1).